213 P.3d 1014

**In re MH–2008–000867.**

**No. 1 CA–MH 08–0022.**

Court of Appeals of Arizona, Division 1, Department D.

July 30, 2009.

---

288

James J. Haas, Maricopa County Public Defender By Tennie B. Martin, Deputy Public Defender, Phoenix, Attorney for Appellant.

Andrew P. Thomas, Maricopa County Attorney By Anne C. Longo, Deputy County Attorney And Geraldine L. Roll, Deputy

County Attorney, Phoenix, Attorneys for Appellee.

James P. Walsh, Pinal County Attorney By Ronald S. Harris, Deputy County Attorney, Florence, Amicus Curiae.

## OPINION

OROZCO, Judge.

¶ 1 Appellant challenges the court order for involuntary mental health treatment. He argues the trial court committed reversible error by allowing one of the two testifying doctors to appear telephonically when the doctor was present in the greater metropolitan area in which the hearing occurred [1] and the State failed to demonstrate that the doctor was truly unavailable to appear in person. For the reasons stated below, we agree and accordingly vacate.

## FACTUAL AND PROCEDURAL HISTORY

¶ 2 Appellant was hospitalized at the Arizona Heart Institute/Phoenix Children's Hospital in 2006 for a heart condition, an allergic reaction and possible schizophrenia. When he was released, he went to a Banner Health facility for behavioral-health follow-up, but he and his mother (Mother) left before Appellant could be evaluated.

¶ 3 On April 21, 2008, Dr. L. filed a Petition for Court–Ordered Evaluation of Appellant. Dr. L. stated that although Appellant did not believe he needed mental health treatment, Dr. L. believed Appellant to be "paranoid and markedly delusional." Dr. L. averred that there was reasonable cause to believe Appellant had a mental disorder, and as a result, was a danger to himself and others, particularly Mother. Dr. L. noted that Appellant threatened to kill Mother and "displays manic symptoms."

¶ 4 Mother completed an accompanying Application for Involuntary Evaluation and Application for Emergency Admission for Evaluation. She stated that Appellant was delusional and paranoid and thought the Mexican Mafia was threatening to cut off his fingers and then kill him. She stated Appel-

lant carried a gun and told her he would be "better off dead" and wanted to "go out with a bang."

¶ 5 On April 24, 2008, Dr. H. filed a Petition for Court–Ordered Treatment of Appellant, stating that Appellant was a danger to himself and others and was persistently or acutely disabled. In an accompanying affidavit, Dr. H. stated that he examined Appellant, then twenty-one years old, and arrived at a probable diagnosis of mood disorder, not otherwise specified. Appellant told Dr. H. that his suicidal statements to his Mother were exaggerations. Appellant also told Dr. H. that although he had a "hyper" personality, he did not believe he was mentally ill or needed psychiatric medications. Appellant showed "no evidence of delusional thinking during the interview." Nevertheless, Dr. H. concluded Appellant required involuntary inpatient hospitalization "to ensure that he is compliant with recommended medications, to ensure that he does not harm himself or others, and to ensure that his psychiatric symptoms stabilize before he would be safe to be discharged back into the community."

¶ 6 In a second attached affidavit, Dr. F. stated he examined Appellant and diagnosed him with mood disorder, polysubstance dependence and cannabis abuse. In his interview with Dr. F., Appellant acknowledged he was concerned about the Mexican Mafia. Appellant told Dr. F. he self-medicates with marijuana when under stress. Dr. F. concluded that Appellant's "insight and judgment are impaired." He stated that Appellant's symptoms "appear to be acutely disabling."

¶ 7 A hearing was held on April 30, 2008, on the Petition for Court–Ordered Treatment. S.M., a woman who once dated Appellant, testified first. She stated she still saw Appellant occasionally and he never threatened her. She stated she never saw him do anything that would make her concerned he was a danger to himself or others.

¶ 8 Mother testified Appellant recently had been having "manic episodes" that frightened and alarmed her. She said Appellant told

---

1. The doctor was in Phoenix, and the hearing was in Mesa.

her "numerous times [that] he [did not] care if he died."

¶ 9 I.C., a roommate/tenant of Appellant, testified that Appellant's behavior recently had become "very erratic, and he seemed like he was aggressive." He stated he had not seen Appellant do anything he thought represented a danger to himself.

¶ 10 Dr. H. testified he evaluated Appellant and noticed symptoms of bipolar disorder. He testified Appellant admitted experiencing symptoms of confusion but attributed it to coming off cocaine. Dr. H. stated that since his initial evaluation, he had spent additional time with Appellant and revised his diagnosis from mood disorder, not otherwise specified, to bipolar disorder, manic phase.

¶ 11 Dr. F. testified telephonically. At the outset, Appellant's counsel objected and requested Dr. F. be asked to appear in person. Dr. F. told the court over the phone that he was, at the moment, attending a mandatory resident training program at the Phoenix campus of the University of Arizona. Appellant's counsel argued that Appellant had "a right of confrontation, to see the witness, to see how he behaves here in court, and he believes that's crucial to the Court to see that also." Counsel for Appellee argued that he was not provided with sufficient advance notice that Appellant wanted Dr. F. to testify in person: "[T]here are times, and especially for residents, where they have training that sets up this, these conflicts.... We did not have enough notice to produce Dr. [F.], and to resolve this conflict." The court denied Appellant's request that Dr. F. be required to appear in person in court without making any factual findings regarding Dr. F.'s availability.

¶ 12 Dr. F. testified that when he initially interviewed Appellant, he observed "symptoms of mania." Similarly to Dr. H., Dr. F. testified that his diagnosis of Appellant evolved from mood disorder to probable bipolar disorder. On cross-examination, Dr. F. acknowledged that Appellant's stress, difficulty sleeping and irritability could be a reaction to being held in a hospital against his will. Also there were questions posed to Dr.

F. that he could not answer because he did not have his affidavit or Appellant's medical records with him.

¶ 13 Appellant testified he told Mother the Mexican Mafia was after him and was going to cut off his fingers because he wanted her to give him money, not because it was true. He testified he never said he would be better off dead and did not want to die, adding, "I actually like my life.... I do feel that I have the potential to make a lot of money and be a successful individual." He testified he told Mother he was not afraid to die because he believed that when he dies, he will go to Heaven and be with his deceased stepfather, with whom he was very close.

¶ 14 The court found by clear and convincing evidence that Appellant was suffering from a mental disorder and, as a result, was "persistently or acutely disabled." The court ordered treatment for a period not to exceed 365 days, including inpatient treatment for not more than 180 days. Appellant timely appealed. We have jurisdiction pursuant to Arizona Revised Statutes (A.R.S.) sections 12–2101.K (2003) and 36–546.01 (2003).

## DISCUSSION

¶ 15 As an initial matter, we note that this appeal is moot in the sense that Appellant appeals from a treatment order that has expired. This situation is largely due to requests for extensions of time filed by Appellant's counsel on appeal. However, we consider issues that are moot when they are "of great public importance or are capable of repetition yet evading review." *In re MH 2005–001290*, 213 Ariz. 442, 443, ¶ 7, 142 P.3d 1255, 1256 (App.2006). We proceed to decide this appeal on its merits because: (1) the issue presented is capable of repetition yet evading review, given that the maximum length of a treatment order under the statute is 365 days [2] and in many cases the length is considerably shorter; and (2) the issue is of great public importance, given the liberty interest at stake.

¶ 16 Under Arizona law, the evidence presented at a hearing on a Petition for Court–Ordered Treatment must include "the testi-

---

2. A.R.S. § 36–540.F.4 (2003).

mony of two or more witnesses acquainted with the patient at the time of the alleged mental disorder and testimony of the two physicians who performed examinations in the evaluation of the patient." A.R.S. § 36–539.B (2003). "The requirements of subsection B are in addition to all rules of evidence and the Arizona rules of civil procedure, not inconsistent with subsection B." A.R.S. § 36–539.D.

¶ 17 Appellant asserts that his right to due process was violated when the second testifying physician was permitted to appear telephonically. Due process is a requirement at involuntary commitment hearings "because civil commitment constitutes a significant deprivation of liberty." *In re MH 2004–001987,* 211 Ariz. 255, 259–60, ¶ 20, 120 P.3d 210, 214–15 (App.2005) (quoting *Maricopa County Cause No. MH–90–00566,* 173 Ariz. 177, 182, 840 P.2d 1042, 1047 (App.1992)). The right to confrontation under procedural due process is "similar" to the right to confrontation under the Confrontation Clause of the Sixth Amendment to the United States Constitution. *Id.* at 260, ¶ 21, 120 P.3d at 215 (citing *Greene v. McElroy,* 360 U.S. 474, 496–97, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959)). At involuntary commitment hearings, the patient must " 'have an opportunity to be heard, [and] be confronted with the witnesses against him.' " *Id.* at ¶ 20 (quoting *Specht v. Patterson,* 386 U.S. 605, 610, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967)).

¶ 18 The two-prong test for evaluating whether telephonic testimony is admissible is whether allowing it was "necessary to further an important public policy and … the reliability of the testimony [was] otherwise assured."[3] *Id.* at ¶ 21 (quoting *Maryland v. Craig,* 497 U.S. 836, 850, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990)). "Providing individuals with needed mental health care on a timely basis is an important public policy." *Id.* at ¶ 22. The question is whether telephonic testimony of a doctor at an involuntary commitment hearing, without a

finding that the doctor is truly unavailable, may nevertheless be "necessary" to further that public policy. We consider this to be a mixed question of law and fact, and we review the court's ultimate legal conclusion de novo. *Id.* at ¶ 24.

¶ 19 Appellee asserts Appellant failed to give them sufficient notice that he wanted both doctors to testify live, and therefore the telephonic testimony was necessary "[g]iven mental health hearings' compressed timeframes." At the hearing, counsel for Appellee argued that "[u]sually the public defenders give us notice [when they want] a full hearing so that we can make arrangements." Appellant's counsel countered that "[u]ntil they hear otherwise they're always supposed to assume that we're going to have a full hearing." Nothing in the statute governing the hearing process requires a patient to give advance notice when he wants witnesses to appear in person. A.R.S. § 36–539. Appellee cites to no authority requiring advance notice, but argues that giving such notice is the "customary practice." Although following such a practice may be the custom, and open communication between opposing counsel is to be encouraged, we will not read into the statute an additional requirement not placed there by the legislature. *See State v. Connolly,* 216 Ariz. 132, 133, ¶ 4, 163 P.3d 1082, 1083 (App.2007); *City of Tempe v. Fleming,* 168 Ariz. 454, 457, 815 P.2d 1, 4 (App.1991) (courts "will not read into a statute something which is not within the manifest intent of the legislature as indicated by the statute itself … nor will [the courts] inflate, expand, stretch or extend a statute to matters not falling within express provisions.") (Internal citations and quotations omitted.).

¶ 20 In *In re MH 2004–001987,* we addressed whether telephonic testimony at an involuntary commitment hearing was necessary to further an important public policy where the witness was in another state. 211 Ariz. at 260–61, ¶ 24, 120 P.3d at 215–16. We

---

**3.** Although Appellant states on appeal that "a person who identified himself on the telephone as Dr. [F.] was allowed to testify telephonically," puts the doctor's name in quotes at one point, and refers to the "voice claiming to be [Dr. F.]," he does not argue that someone other than Dr. F. was on the phone, and he did not dispute Dr. F.'s identity at the hearing. Therefore, reliability is not an issue on appeal.

held that such testimony may be allowed, depending upon the trial court's factual determinations. *Id.* The trial court found that since mental health hearings operate on a "very truncated time table," the patient's sister had not been given adequate time to make plans to travel from Alabama to Arizona to testify. *Id.* at 257, ¶ 7, 120 P.3d at 212. The court therefore determined that in that situation, it was necessary to allow the telephonic testimony of the sister, and this court affirmed. *Id.* at 260, ¶ 24, 120 P.3d at 215.

¶ 21 In this case, however, Dr. F. was in the metropolitan area, and the only reason in the record why he was not present at the hearing was that Appellee's counsel assumed it would be unnecessary for him to physically appear at the hearing to testify. The court made no factual findings or determinations that, in light of the circumstances, telephonic testimony was necessary.

¶ 22 The Nebraska Supreme Court has addressed whether, when there has been no demonstration of necessity, a medical witness may testify telephonically at an involuntary commitment hearing. The court held that when there is no demonstration of "necessity" for a psychiatrist to appear by telephone, acceptance of the doctor's telephonic testimony at an involuntary commitment hearing violates the patient's rights. *In re S.B.*, 263 Neb. 175, 639 N.W.2d 78, 83 (2002). "Although there was argument by the State before the district court that mental health professionals in general are unable to appear personally because of their schedules," the court held it was error to admit the doctor's telephonic testimony where the State failed to demonstrate that the doctor in question was actually unable to appear personally.

*Id.* at 83–84. The court cited to *United States v. Jacobs*, 97 F.3d 275, 282 (8th Cir. 1996), for a rule that "in order to admit telephonic testimony of a mental health professional, the State must demonstrate that . . . the mental health professional is 'truly unavailable' as a witness, thus necessitating telephonic testimony."[4] 639 N.W.2d at 83.

■ ¶ 23 We agree with the Nebraska Supreme Court that absent a showing of true necessity, based on unavailability, telephonic testimony of a doctor at such a hearing violates the patient's rights. Here, as in *In re S.B.*, Appellee failed to demonstrate that the witness was unavailable to appear in person.[5]

■ ¶ 24 "The requisite finding of necessity must of course be a case-specific one." *Craig*, 497 U.S. at 855, 110 S.Ct. 3157. There can be no hard-and-fast rule as to what distance between doctor and hearing, and/or what other specific factual situations in a given case, render a doctor truly unavailable and his telephonic testimony necessary. We leave such determinations to the sound discretion of trial courts, but we will not affirm a trial court decision to allow such telephonic testimony absent a sufficient factual showing of necessity.

¶ 25 Appellee argues that this court's decision will affect hearings in rural counties that "routinely rely upon physicians who live or work outside of their communities." Additionally, the Pinal County Attorney's Office filed an Amicus Curiae Brief in this case, stating that Pinal County court-ordered treatment hearings are held in Florence, the Pinal County seat, with psychiatrists testifying by telephone from offices a great distance away in Apache Junction (Pinal Coun-

---

4. Nebraska's state law affords subjects of commitment hearings the right to cross-examine adverse witnesses "equivalent" to the right afforded criminal defendants under the Confrontation Clause. Neb.Rev.Stat. § 71–954 (2008). While Arizona does not have a similar statute, as outlined above, this court has stated that because such a significant liberty interest is at stake, the civil commitment hearing subject's right to confrontation in Arizona is "similar" to that right under the Confrontation Clause. *See* ¶ 17, supra.

5. Our holding today also is consistent with our holding in *State v. Moore*, 203 Ariz. 515, 518,

¶ 11, 56 P.3d 1099, 1102 (App.2002), in which we held that in a criminal trial, "a defendant's confrontation rights are violated when telephonic testimony is admitted . . . and the State has not demonstrated a compelling reason or need for the telephonic testimony to substitute for in-person testimony." *See also Christian v. Rhode*, 41 F.3d 461, 467 (9th Cir.1994) (defendant's rights under the Confrontation Clause violated when deposition testimony taken abroad was admitted in place of live testimony and the unavailability of the witness was not adequately demonstrated).

ty), Mesa (Maricopa County) and Tucson (Pima County). Should a petitioner in such a case demonstrate to the court that the doctor-witness was truly unable to be physically present at the commitment hearing, due, for example, to the distance the doctor would need to travel, or for another compelling reason, our holding today would allow that telephonic testimony. In this case, however, there was no such showing.

¶ 26 The Amicus cites to *In re W.J.C.*, 124 Wis.2d 238, 369 N.W.2d 162 (App.1985). In that case, the Wisconsin Court of Appeals followed the due process analysis set forth in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). It was difficult for the court to determine from the record all the fiscal and administrative burdens that in-court testimony would entail. *W.J.C.*, 369 N.W.2d at 164. However, the court took judicial notice "that the costs of securing experts, especially from another area, are considerable." *Id.* We do not believe our holding in this case is inconsistent with *W.J.C.* because here there was no evidence that requiring Dr. F. to appear in person would cause considerable expense to himself or anyone else.

## CONCLUSION

¶ 27 For the above stated reasons, we vacate the order of involuntary treatment.

CONCURRING: MICHAEL J. BROWN and PATRICIA K. NORRIS, Judges.